## COMMONWEALTH *vs.* ALEXANDER RODRIGUEZ.

No. 00-P-1085.

Hampden. November 15, 2002. - February 12, 2003.

Present: LAURENCE, KAPLAN, & DOERFER, JJ.

*Practice, Criminal,* Assistance of counsel. *Evidence,* Credibility of witness, Religious beliefs.

At a hearing on a criminal defendant's motion for a new trial, the judge did not err in concluding that the defendant's trial counsel was not ineffective with respect to locating and presenting at trial a witness whose allegedly exculpatory testimony would have had only remote bearing on the principal crime charged. [371-373]

At a criminal trial, error, if any, arising from the prosecutor's cross-examination of the defendant concerning a complaining witness's religious practices (specifically, the fact that she placed Bibles in the windows of her home), and his mention of those practices during closing argument, did not create a substantial risk of a miscarriage of justice, where the evidence was intended neither to appeal to the jury's religious beliefs nor to bolster the witness's credibility, but rather to emphasize the witness's simplemindedness. [373-376]

COMPLAINT received and sworn to in the Springfield Division of the District Court Department on May 14, 1998.

The case was tried before *William W. Teahan, Jr.,* J., and a motion for a new trial, filed on November 15, 2000, was heard by him.

*Bruce Green* for the defendant.

*Sidney E. Reavey,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A jury of six in District Court found the defendant, Alexander Rodriguez, guilty of indecent assault and battery upon a child less than fourteen years of age (actually an infant about five months old) and of the subsequent related crimes of assault and battery by means of a dangerous weapon (a chair), assault and battery, and malicious destruction of property of a

value less than $250. The defendant appealed from the judgments of conviction. Later he moved for a new trial based on a claim of ineffective assistance by his trial counsel, and he appeals from the order of the trial judge, after hearing, denying the motion. In the appeals in our court, argued together, the defendant attacks the order and, reaching back, attacks the judgments on the ground that the prosecutor in cross-examining the defendant and closing to the jury referred improperly to a religious display by a prosecution witness. We affirm the judgments and order.

## TRIAL

*Commonwealth's case.* Here follows a summary of testimony of Nancy Lopez (Nancy), as translated from the Spanish by an interpreter. Nancy's daughter, Wanda Loanis (Wanda), met the defendant Rodriguez when they were both in the Job Corps. They later met by chance, and Wanda learned that the defendant, his companion Denise Lopez (Denise), and their twin infants were without a steady home. Wanda spoke to Nancy,[1] and shortly, the defendant and family found themselves installed for a time in the basement of Nancy's house in Springfield, which was also the home of her daughters Wanda, aged 21, and Nancy Loanis, aged 18. The defendant said he would "give [Nancy] something" in the way of rent, but he did not do so. The basement was spare, without facilities besides washer and dryer, so for living accommodations one had to use the stairs to reach the kitchen or bathroom.

On May 2, 1998, the Rodriguez family having been so located for perhaps two months, Nancy heard a baby crying and went down the stairs to the basement to inquire. The defendant was there with his daughter, some five months old; the twin boy lay apart on a mattress. The girl "didn't have any diapers" and the defendant was licking her vagina. Shocked, Nancy exclaimed, "Alexander, what are you doing?" The defendant said, "You can't say anything. The grandmother of the baby is with DSS [the Department of Social Services], and nobody is going to believe you." Nancy returned to the kitchen. As Denise left the

---

[1]Not related to Denise.

bathroom nearby, Nancy told her what she had seen and added, "Please separate yourself from him, you should get some help." Nancy also told her daughters. She volubly and repeatedly ordered the defendant and family out of the house.

It was not until several days later that they did leave. At 10:00 P.M. on May 5, the defendant and Denise appeared at the door to collect some of their belongings. Evidently they had been drinking: they had beers in their hands. They set the twins in car seats on the floor. They commenced to talk harshly and soon became aggressors ("talking bad" and getting "physical") in an encounter in the kitchen with Nancy, and then, as the fight developed, with her daughters. The defendant seized some dining plates and threw them to pieces on the floor. He struck Nancy. He picked up a chair and hit Nancy with it. Denise took part in the fracas. Wanda got to a telephone to call the police. Seeing this, the defendant left the house with Denise and the twins.

When the police arrived, Nancy gave an oral account of the crime in the basement and of the fight in the kitchen to a Hispanic officer, who told her a detective would come around to take down her story. On May 9, Detective Eddie Ramos called on Nancy; they conversed in Spanish and he wrote a statement in English, to which Nancy subscribed, recalling the events of May 2 and May 5. Nancy testified also that she wrote a letter to a friend, Edward Munez, "in case anything happened to me"; this was in response, she said, to threats from Denise. Cross-examination of Nancy brought out a few discrepancies between her direct testimony and the statement as recorded by Detective Ramos.[2]

Testimony by the daughters, which related only to the kitchen episode of May 5, supported in general Nancy's version that the visitors were the aggressors.

*Defendant's case.* The defendant, who was the sole witness for the defense, denied there was any such basement episode as described by Nancy. He attributed her deliberate falsehood (as he would call it) to her resentment upon her learning that he

---

[2]For example, the statement did not refer to the Department of Social Services or to beers in the hands of the defendant and Denise.

had advised a friend[3] not to lend money to her. (The defendant suggested as a reason for this advice that he had just given money to Nancy as rent.) As to the encounter in the kitchen, the defendant said he had not wielded any plates or a chair, and he asserted that Nancy and the daughters had been the forward parties attacking Denise and him. He said that besides those named as present in the kitchen, a "neighbor" (unnamed) was present. The defendant had tried to reach a telephone in the house to call the police, but had been thwarted; on leaving the house, he had gone to a friend's place for that purpose, but it had no telephone. He had gone to a pizzeria, from which he called the police; they came and conducted him back to the house. He collected the family belongings from outside the house, where they had been thrown. The prosecutor in cross-examining the defendant put some emphasis on the point that, had any police arrived at the pizzeria, they would likely have checked and found a warrant outstanding against the defendant, and thereupon arrested him on the spot. The defendant said he indeed was puzzled that this had not happened.

After closing speeches and the judge's instructions, all without objection, the jury on January 27, 1999, brought in verdicts of guilty of the four offenses charged, and judgments entered accordingly.[4] (The questioned parts of the prosecutor's cross-examination and closing speech are set out and considered *infra.*)

## MOTION FOR A NEW TRIAL

The defendant on March 1, 1999, noticed his appeal to our court from the judgments of conviction. On November 27, 2000, he moved in District Court for a new trial pursuant to Mass.R. Crim.P. 30(b), 378 Mass. 900 (1979). We withheld proceedings on the appeal of the conviction pending decision of the new trial motion. The judge who had presided at the trial, after hearing on March 30, 2001, denied the motion with findings and order on April 5, 2001, and the case is here on appeal from the order and from the previous judgments.

---

[3]The reference may be to Hector Abreu, whose name will reappear *infra.*

[4]The defendant was sentenced to two and one-half years in a house of correction on the indecent assault and battery offense and to six-month terms on the other offenses, all concurrent with the longer sentence.

In the new trial motion, new counsel for the defendant contended that trial counsel had rendered ineffective assistance: had counsel afforded proper representation, he would have found, and offered as a witness at trial, the "neighbor" mentioned by the defendant — now claimed to be one Wanda Ramos[5] — and Wanda Ramos, if called, would have testified in such a manner about Nancy's and the daughters' aggressive actions in the kitchen that would have impugned their accusations and cast doubt on the defendant's guilt of the crimes charged against him.

The defendant's motion was accompanied by affidavits of the defendant and Wanda Ramos. The defendant said that he was in jail during the five months from his arraignment to trial; the only occasions on which he spoke to counsel (in deficient English) were at arraignment, for five minutes, and at pretrial conference, for less than a minute; counsel never visited him in jail. He could not get through to counsel to tell him about Wanda Ramos. The latter in her affidavit said that she was present on May 5 and observed that Nancy and the others were the attackers and the defendant a frustrated peacemaker.

The judge heard testimony by the defendant and trial counsel and made findings, in our view supported by the testimony, contrary to the defendant's assertions. Counsel had conferred with the defendant not only at the two admitted instances but on other occasions and with sufficient interpreter's help along the way. Denise provided counsel with information about May 5 and suggested that Hector Abreu should be a witness at trial. But when counsel spoke with Hector (counsel happened to be acquainted with him), Hector disclaimed any knowledge and provided no help. The defendant had plenty of opportunity to get in touch on his own initiative with counsel, yet never communicated the name of Wanda Ramos to him[6]; at the trial, as noted, the defendant had spoken only of a "neighbor" supposedly present on May 5. The judge, indulging the assumption

---

[5]There is no indication that she is connected to Detective Ramos.

[6]The defendant testified at the hearing on the motion that he told trial counsel of Wanda Ramos only on the day of trial — strange conduct if he considered her important. Trial counsel testified the defendant at no point mentioned Wanda Ramos to him.

that Wanda Ramos, had she appeared, would testify in consonance with her affidavit, observed that, at best, she would merely have corroborated the defendant's testimony about May 5 and at all events, we may add, having only remote bearing on the principal crime. As to the possibility of defense counsel's calling Denise as a witness, she was under pending charges at the time of trial, and would claim privilege by advice of separate counsel. To conclude, the judge found trial counsel not ineffective in respect to presenting Wanda Ramos as a witness, and held that the defendant was not deprived of any available substantial ground of defense.[7] (There was no argument that defense counsel was ineffective in a forensic sense in the trial proper.)

## PROSECUTOR'S ALLEGED FAULT

In his brief in our court, the defendant for the first time questions the judgments of conviction, on the ground that the prosecutor had misbehaved to the defendant's prejudice. Concluding cross-examination, the prosecutor asked the defendant whether it was not the case that Nancy stuffed the windows of her house with copies of the Bible. The defendant confirmed this.[8] Then, addressing the jury, the prosecutor said and repeated that Nancy as a witness seemed to bear herself as a simple and sincere person, thus unlikely to have contrived to fabricate the awful accusation against the defendant. In support of these characterizations of Nancy, the prosecutor spoke of the

---

[7] For the respect owed to the findings upon a new trial motion by the judge who presided at the trial, see *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990).

[8] Q. "Did you see what [Nancy] has in her windows in her house, sir?"
A. "Bibles, yes."
Q. "She has Bibles in every window, doesn't she?"
A. "Yes."
Q. "How many Bibles would you say she has in her house?"
A. "She's got one in every window."
Q. "In every window; and there's other Bibles in the house besides those, aren't there?"
A. "I didn't check that out."

Bible display but he was not saying "anybody who has a Bible couldn't make up the story."[9]

Our courts have long agreed with the proposition expressed in Fed.R.Evid. 610 and the corresponding Proposed Mass.R. Evid. 610: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature [the witness's] credibility is impaired or enhanced." See the approving references to this text in *Commonwealth* v. *Dahl*, 430 Mass. 813, 823 (2000); *Commonwealth* v. *Murphy*, 48 Mass. App. Ct. 143, 144 (1999). See also Mueller & Kirkpatrick, Federal Evidence § 289 (2d ed. 1994). In the spirit of the admonition and with due regard to the treacherousness of the general terrain, the prosecutor would have done better to omit his bits of bravura.

We have to consider, however, as in previous cases, whether the prosecutor's insensitivity created a "substantial risk of a miscarriage of justice," the standard to be applied where the defendant did not raise objection at the time, see *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). Of course, the omission to react and respond may itself suggest that the defense thought the words not particularly remarkable when they were uttered — a negative factor when one begins to weigh the "substantiality" of the "risk" that the jury would be led afield.

It is possible to conceive that the prosecutor planted some

---

[9]"You're being asked to believe that [Nancy] made it up, that she concocted that story. . . . [I]n my opening statement I asked you to observe her, observe her demeanor, observe other little things about her. . . . [A]fter viewing her for the amount of time that you did, and hearing the other things about her through her daughters, and also through the defendant about all the Bibles she keeps in her windows . . . I suggest to you that you'll come to the conclusion that is quite simple, she is too simple, too sincere to concoct a story of that magnitude. . . . This is a woman who keeps Bibles in her windows. I'm not saying anybody who has a Bible couldn't make up the story, but listen to that, listen to her, listen to her children, listen to how simple they are . . . .

". . .

"This is someone who appears to be exactly what she is, a simple, Bible-reading person . . . .

". . .

"Ladies and gentlemen, I'll go back to where I started, they're too simple, too sincere to concoct a story of that magnitude. A woman with Bibles, with Bibles throughout her house."

seemingly casual questions and answers as a base for a deliberate appeal in the closing to religious fervor, but the prosecutor's evident purpose seems to us to have been quite different. Far from being used to stir denominational or race-tinted differences, the Bible display was mentioned to show how simple-minded Nancy appeared to be: what one thinks of is that Nancy posted the Bibles in the windows as celestial protection of the home.[10] A jury could find Nancy's character as a witness so far shown in her testimony and deportment that the addendum about the windows could not figure as important.

If, besides simplemindedness, the Bible episode is understood to represent Nancy's belief in God, then it did no more than repeat and perhaps somewhat reinforce her standard witness's oath and, as the prosecutor himself conceded, such profession of belief does not ensure truth telling, so common experience shows.

Finally, turning to the decisions, the present case comes nowhere near in possible toxicity to that in which a "substantial risk" could be found,[11] and well within the range of those in which it could not be.[12]

We surmise that the jury could have found the defendant's credibility sorely weakened by his own prevarications, from the

[10] A colloquy during sentencing procedure following the verdict so hinted at Nancy's purpose.

[11] In *Commonwealth* v. *Mahdi*, 388 Mass. 679, 691-693 (1983), the defendant, a black Muslim, tried for the murder of a white man, claimed he lacked mental capacity at the time for fear of excommunication from his religion. The prosecutor cross-examined him on the tenets of the religion which, the prosecutor suggested, exalted the "colored man" over the "Caucasian," and tended to explain the defendant's animus in committing the murder. The prosecutor's closing speech was in similar vein. The court said, "[t]he only apparent purpose of such questioning was to inject racial hatred into the trial." *Id.* at 693. The defense had not objected. The judgment was reversed (there were additional grounds).

[12] In *Commonwealth* v. *Boyd*, 367 Mass. 169, 184-185 (1975), at the trial before an all-white jury of a black Muslim prison inmate for the murder of a black non-Muslim inmate, where the defense was insanity, the defendant's psychiatrist testified to the defendant's intense belief that the victim must be removed to protect the Muslim movement and its minister in the jail, and that killing the victim would "please Allah." Challenging the genuineness of the defendant's fervor, the prosecution adopted a line of questioning designed to show that religious zeal was secondary to other goals of the movement. The court would not reverse the judge's determination, over objection, to allow the

attribution of motive to Nancy through his story about the absent witness. Any undeserved improvement of Nancy's credibility by means of the Bibles seems marginal.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

following question: "Religious values of secondary importance, main concept is group solidarity anti-white. A pro-Black feeling primarily?"

In *Commonwealth* v. *Lee*, 394 Mass. 209, 219-220 (1985), the defendants, who were on trial for an armed holdup, manifested their Muslim beliefs. The prosecutor, in cross-examination of a defendant, asked whether he understood he had an obligation to tell the truth. The question was allowed over objection. The prosecutor then, without objection, asked a series of questions about the defendant's religious beliefs. Any error was not preserved for review, and in any event there was not a substantial risk of a miscarriage of justice.

In *Commonwealth* v. *Dahl*, 430 Mass. 813, 822-824 (2000), a murder case, a prosecution witness testified she decided to come forward only after consulting with her priest. Also, she was considering studying to be a nun, stating, "I want to do a godly thing." The defendant objected. The evidence should have been excused, the court said, but the jury hearing this witness would likely have found her credible even without the testimony (and other witnesses had already identified the defendant). The witness should not have been allowed to testify holding rosary beads (not objected to), but this did not add to the prejudicial effect. The conviction was affirmed.

Finally, in *Commonwealth* v. *Murphy*, 48 Mass. App. Ct. 143, 145-146 (1999), during a trial of charges of unnatural intercourse with a child under sixteen, the prosecutor built up the credibility of the ten year old complaining witness by asking whether she believed in God and the oath as a promise to God. The court said that these questions were within tolerable limits; the further questions, whether the child had been instructed in catechism, were "over the top." The error was without consequence, as more questioning indicated that the child was more concerned about punishment by her mother than by God. The convictions (of lesser offenses) were affirmed.