## COMMONWEALTH *vs.* JAMES P. KARTELL.

No. 02-P-125.

Essex. November 22, 2002. - June 30, 2003.

Present: GELINAS, COWIN, & McHUGH, JJ.

*Homicide. Practice, Criminal,* Instructions to jury. *Self-Defense. Evidence,* Self-defense, Reputation, Prior misconduct, Spontaneous utterance, Religious beliefs. *Religion.*

At a murder trial, after which the jury returned a verdict convicting the defendant of voluntary manslaughter based on his having fired two shots at the victim, each of which standing alone would have caused the victim's death, the absence of an instruction telling the jury to return a verdict of not guilty if they concluded that the Commonwealth failed to disprove self-defense in connection with the first of the two shots did not create a substantial risk of a miscarriage of justice, where the victim was alive when the defendant fired the second shot, and therefore, justification for the defendant's first shot did not prevent the jury from returning a manslaughter verdict if persuaded beyond a reasonable doubt that the defendant had not fired the second shot in self-defense. [430-431]

At a murder trial in which self-defense was a contested issue, the judge properly excluded evidence of the victim's reputation for violence as too remote. [431-433]

At a criminal trial, the judge properly admitted in evidence as a spontaneous utterance a description of the defendant's habit, where the statement of personal habit was not offered as evidence that the defendant acted in a manner consistent with the habit, but as circumstantial evidence of the defendant's intent when he departed from his habit. [433-434]

At a criminal trial, the judge did not abuse his discretion in allowing the Commonwealth to introduce against the defendant evidence of his religious beliefs, or lack thereof, where the Commonwealth's purpose in asking the questions was both secular and relevant, and where the questions themselves were reasonably designed to achieve the secular goal; nor did the judge abuse his discretion in giving a limiting instruction regarding such evidence, where, although a reformulated statement of the instruction would have produced clearer boundaries for the jurors' use of the particular evidence, the judge's statement to counsel and jury alike that he was not instructing them that a person's religious belief reflected the person's credibility rendered harmless any lack of clarity in the instruction. [434-438]

INDICTMENT found and returned in the Superior Court Department on March 31, 1999.

The case was tried before *Isaac Borenstein*, J.

*Michael J. Traft* (*J.W. Carney, Jr.*, with him) for the defendant.

*Gregory I. Massing*, Assistant District Attorney (*Frederick McAlary*, Assistant District Attorney, with him) for the Commonwealth.

McHugh, J. On the evening of February 23, 1999, the defendant and Janos Vajda engaged in a violent confrontation at Methuen's Holy Family Hospital where Susan Kamm, the defendant's wife, was being treated for pneumonia. The confrontation ended when the defendant shot Vajda twice, killing him. As a result, the defendant was indicted for murder in the first degree. After trial, the jury returned a verdict convicting him of voluntary manslaughter. He appeals, pointing to a series of alleged trial errors. We affirm.

The confrontation's basic ingredients and its underpinnings are undisputed. The defendant and Kamm, both of whom were physicians with privileges at Holy Family Hospital (hospital), had been married for more than thirty years. Late in 1998, Kamm told the defendant that she intended to leave him because Vajda, who was active in the temple Kamm attended and whom she had met at Friday night temple services, had become her boyfriend. The defendant became despondent at the news and widely broadcast his marital troubles to all who would listen. A few months after her announcement, Kamm went to live with Vajda. The defendant sought reconciliation without success and, approximately eight days before the shooting, Kamm asked the defendant for a divorce.

On February 20, 1999, Kamm was admitted to the hospital for treatment of pneumonia. The defendant visited her several times. On one visit, he found Vajda in the room and asked him to leave. Vajda complied without incident.

Early on the evening of February 23, the defendant again visited Kamm in her hospital room. Upon his arrival, he found Kamm, an examining physician, and Vajda. Again, he asked Vajda to leave, but Kamm intervened and Vajda stayed. After the examining physician left, the defendant and Vajda exchanged caustic words. The words quickly produced an exchange of blows. Both men traded punches and, at one point, Vajda ap-

peared to be having the better of the fight. Whatever advantage Vajda may have had, however, disappeared when the defendant reached into his pocket, retrieved a pistol, and shot Vajda twice, first in his upper abdomen and then in the back of his head. Vajda expired soon after he was hit with the second shot.

In this appeal, the defendant claims (1) that the trial judge's instructions were deficient; and (2) that the trial judge made errors in admitting and excluding evidence, specifically in excluding evidence of Vajda's prior violent acts, in admitting an excited utterance, and in allowing interrogation regarding the defendant's religious beliefs. We examine his claims in that order.[1]

1. *The instructions.* Regardless of precisely how the fight started, self-defense became a live issue at trial. There was abundant evidence from which the jury could have concluded that the defendant was getting the worst of the fight immediately before he fired the first shot into Vajda's abdomen. There was also abundant evidence from which the jury could have concluded that the defendant fired the second shot into the back of Vajda's head, from just inches away after he immobilized Vajda with the first shot and as he said to Kamm, "Look at him now." The undisputed evidence from the medical examiner was that, standing alone, each shot would have caused Vajda's death.

The defendant argues that the judge's instructions erroneously failed to tell the jury to return a verdict of not guilty if they concluded that the Commonwealth failed to disprove self-defense in connection with the first of the two shots. See generally *Commonwealth* v. *Beauchamp,* 49 Mass. App. Ct. 591, 599-600 (2000). In the defendant's view, the fatal impact of the

---

[1]We have also considered, and rejected, the defendant's other claims of error. First, there was circumstantial evidence from which the jury could have concluded that the defendant was aware of the hospital policy against carrying firearms on the hospital campus, and the judge's instructions made it clear that the jury could consider the policy only if they found that the defendant knew of it. Second, although it clearly would have been better if the Commonwealth had disclosed anticipated testimonial changes earlier than it did, our review of the record shows no prejudice, for defendant's counsel skillfully exploited the changes notwithstanding their late appearance. Finally, like the instructions discussed immediately below, the instructions as a whole correctly stated the applicable law and none of the prosecutor's arguments, singly or in the aggregate, created a substantial risk of a miscarriage of justice.

first shot meant that, as a practical matter, Vajda was dead before the second shot was fired. Consequently, the defendant contends, whether he did or did not fire the second shot in the proper exercise of self-defense is irrelevant because that shot did not cause Vajda's death. The defendant did not make that argument at trial, so our task is to determine whether the absence of an instruction limiting the jury's focus to the circumstances surrounding the first shot created a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Vasquez*, 55 Mass. App. Ct. 523, 534 (2002).

The defendant's argument is superficially plausible, for "[w]hatever else it may be, it is not [manslaughter] to shoot a dead body." *People* v. *Dlugash*, 41 N.Y.2d 725, 731 (1977). The problem with the argument, though, is that Vajda, although mortally wounded, was alive when the defendant fired the second shot, a shot that likewise inflicted a mortal wound. Sensibly, the law distinguishes between a shot that will result in someone's death and a shot that has. That distinction is implicit in the well-established proposition "that there may be more than one proximate cause of a victim's death." *Commonwealth* v. *Maynard*, 436 Mass. 558, 563 (2002). Accord *Commonwealth* v. *Stathopoulos*, 401 Mass. 453, 458 (1988) ("In criminal cases, there may be more than one efficient or proximate cause of the prohibited result"). If more than one cause exists, criminal responsibility for each cause is assessed separately. See *Commonwealth* v. *Osachuk*, 43 Mass. App. Ct. 71, 73-75 (1997). See also *Commonwealth* v. *McLeod*, 394 Mass. 727, 745 n.21, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). Justification for the defendant's first shot, therefore, did not prevent the jury from considering justification for the second or from returning a manslaughter verdict if persuaded beyond a reasonable doubt that the defendant had not fired it in self-defense.

2. *Exclusion of evidence of Vajda's reputation for violence.* At some point after he became aware of the relationship between Kamm and Vajda, the defendant examined Probate Court records of Vajda's divorce. In January, 1999, one month before the fatal confrontation, the defendant sought out Vajda's ex-wife to discuss with her information he had found in the records. From

the records and his conversation with Vajda's ex-wife, the defendant learned two things that he sought to introduce as bearing on his state of mind regarding Vajda's propensity for violence. First, in 1981 or 1982, when one of Vajda's daughters was approximately seven or eight years old, Vajda cut off one of her braids as punishment when she failed to perform a homework exercise to his satisfaction. Second, in June, 1995, Vajda's former wife filed a motion in the divorce proceedings for an order excluding Vajda from the marital home. In an affidavit accompanying the motion, the ex-wife said, in substance and effect, that she was afraid of Vajda because he had accused her and her daughters of conspiring against him and of poisoning his food and because he had told their fifteen year old daughter that "[e]very man who asserts his rights gets his penis severed." The defendant was permitted to testify at trial that he became fearful of Vajda after reading the affidavit, but he was not permitted to testify as to its content or to present any testimony about the incident with the braid.

The defendant claims that he was entitled to introduce the contents of the affidavit and evidence of the severed braid under the evidentiary rule allowing for admission of evidence of the defendant's knowledge of a victim's prior violent acts in cases where self-defense is a contested issue. See *Commonwealth* v. *Fontes*, 396 Mass. 733, 735-736 (1986). Admission of that evidence, however, is limited to acts that are not too remote, lest the trial turn into a distracting and prejudicial investigation of the victim's character. *Id.* at 735-737.

Here, the judge excluded the proffered evidence on the ground that it was too remote. As is usually true of evidentiary issues, the trial judge had broad discretion to balance the probative value of the defendant's knowledge of Vajda's acts against the dangers to trial integrity that admission of that evidence posed. See *Commonwealth* v. *Kosilek*, 423 Mass. 449, 459 (1996); Proposed Mass.R.Evid. 403. "There can be no bright line" rule. *Commonwealth* v. *Rodriquez*, 418 Mass. 1, 6 (1994). The judge did not abuse his discretion by excluding evidence of an incident that occurred seventeen or eighteen years earlier or evidence of other incidents that, although more recent, had very little relationship to physical violence. See *Commonwealth* v. *Ko-*

*silek*, 423 Mass. at 458 (no abuse of discretion in excluding evidence of victim's use of physical force while disciplining her child in view of limited probative value of that evidence).[2]

3. *The excited utterance.* Shortly after the fatal shooting, Kamm was removed from her hospital room, taken to a nearby solarium, and attended to by a member of the hospital staff. According to the attending staff member, Kamm was crying hysterically. While in that state, she told the attendant that the defendant had had a gun in his pocket and that he "usually ha[d] it on his leg in a holster . . . [b]ut this time, he had it in his pocket and it was loaded." Over the defendant's objection, the trial judge allowed the Commonwealth to offer that statement as an excited utterance, finding that it had been made

[2]We are equally unpersuaded by the alternative theories of admissibility the defendant suggests, i.e., that the evidence was admissible as of right because it bore on his state of mind and because its admission was warranted under the rule of verbal completeness. Generally, "[w]hen a defendant's state of mind or his knowledge is a factor in the proof of a crime, his proffered testimony concerning his state of mind or knowledge must be admitted." *Commonwealth* v. *Papadinis*, 402 Mass. 73, 74 (1988). See *Commonwealth* v. *Huffman*, 11 Mass. App. Ct. 185, 190 (1981), *S.C.*, 385 Mass. 122 (1982) (exclusion of defendant's testimony was erroneous where issue of his intent "was an essential element of the crime charged"). This well-established rule is rooted in the constitutional principle that "criminal defendants [are guaranteed] 'a meaningful opportunity to present a complete defense.' " *Crane* v. *Kentucky*, 476 U.S. 683, 690 (1986), quoting from *California* v. *Trombetta*, 467 U.S. 479, 485 (1984). However, the defendant's right to explain his state of mind does not strip the trial judge of his " 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' " *Crane* v. *Kentucky, supra* at 689-690, quoting from *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986). For that reason, the Supreme Judicial Court has rejected the proposition that evidence of prior violent acts should be admitted without limitation anytime such evidence might "provide insight" into a defendant's state of mind. See *Commonwealth* v. *Benjamin*, 430 Mass. 673, 679 (2000) (rejecting argument that evidence of victim's reputation be admitted to show its effect on defendant's state of mind and to corroborate defendant's testimony). The doctrine of verbal completeness does not open the door to the admission of an entire conversation each time a portion of that conversation is introduced. *Commonwealth* v. *Leftwich*, 430 Mass. 865, 871 (2000). Instead, admission under the doctrine depends on whether the offered portion of the conversation qualifies or explains the portion previously admitted. *Id.* at 872. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 436 (2002); Liacos, Brodin & Avery, Massachusetts Evidence § 3.12 (7th ed. 1999). The judge acted well within his discretion in concluding that it did not.

"under the impulse of excitement or shock, . . . [that it was] spontaneous to a degree that reasonably negated premeditation or possible fabrication, and . . . [that it] tend[ed] to qualify, characterize or explain the underlying event," i.e., the shooting.

The defendant argues that, insofar as the statement included a description of where he typically carried the pistol, it should not have been admitted because statements about habit are statements about history, not about current observations, and because evidence of personal habit is generally inadmissible. See *Commonwealth* v. *Santiago*, 437 Mass. 620, 626 (2002). However, *Santiago* holds that an excited utterance need not describe the exciting event as long as the utterance is produced by the event's exciting stimulus. *Ibid.* Although statements of personal habit are routinely excluded when offered as evidence that the defendant acted in a manner consistent with the habit, see *Davidson* v. *Massachusetts Cas. Ins. Co.*, 325 Mass. 115, 122 (1949); *Figueiredo* v. *Hamill*, 385 Mass. 1003, 1004 (1982), the habit evidence was offered here not to show conformity, but as circumstantial evidence of the defendant's intent when he departed from habit and placed the pistol in his pocket. For that purpose, the evidence was admissible. Cf. *Commonwealth* v. *Conkey*, 430 Mass. 139, 145 (1999) (admitting evidence of defendant's criminal predilections as evidence of his state of mind at time of incident at issue).

4. *Evidence of religious belief.* The defendant's final claim of error is that the trial judge allowed the Commonwealth to introduce against him evidence of his religious beliefs, or lack thereof. Early in the trial, the Commonwealth elicited evidence to the effect that the defendant sometimes referred to Vajda as "Super Jew." Although defense counsel made no contemporaneous objection when that testimony was first introduced, he successfully objected to the prosecutor's attempt to revisit the subject on redirect examination. In addition, he later moved in limine at a sidebar conference to prohibit any further inquiries along the same lines, contending that the questioning "starts to bring a religious bigotry into" the trial. The trial judge denied the motion and declined to make a global decision admitting or excluding the evidence.

A second prosecution witness thereafter testified about the

defendant's references to Vajda as "Super Jew." Again, there was no objection. This time, however, the judge, sua sponte, instructed the jury that the evidence had been admitted solely as it bore on the defendant's state of mind and "his feelings" and was not to be taken as evidence of his character or of Vajda's.

When the defendant testified, he explained on direct examination that he called Vajda "Super Jew" because he viewed Vajda as "somebody who was engaged in religious affairs almost as a recreation but [took] no mind of the morals and ethics of the religion." When his turn came, the prosecutor explored that explanation during the following exchange:

> Q. "Starting in about 1997, [your wife] started attending services at the temple much more regularly, isn't that correct?"
>
> A. "It is."
>
> Q. "But Doctor, you had indicated on your direct testimony that you are Jewish?"
>
> A. "I did."
>
>     . . .
>
> Q. "Did you attend services at the temple in Andover?"
>
> A. "No."
>
> Q. "Isn't it a fact that you consider yourself an atheist?"

At that point, defense counsel objected and, at sidebar, contended that the questions were a prejudicial and irrelevant inquiry into the defendant's religious beliefs. The prosecutor responded, in essence, that he was seeking to show that the defendant's "Super Jew" reference had nothing to do with the defendant's concern about Vajda's religious hypocrisy and was instead based on his jealousy.

The trial judge overruled the objection and the prosecutor resumed his cross-examination of the defendant, exploring, as he did, whether the defendant's wife had begun to attend services at the temple more and more frequently and whether she had begun mentioning Vajda's name to the defendant when

describing to him her attendance at those services. Then, the prosecutor said, "you did not attend the temple, did you, Doctor?" Defense counsel immediately objected and the court instructed the jury as follows:

> "Jurors, there are no issues in this case about religion or religious beliefs. This area is before you as evidence, if you accept it, and it's up to you to accept it or not, on the witness's credibility, limited to that."

Then came this:

DEFENSE COUNSEL: "May I approach the sidebar, please?"

THE COURT: "No."

DEFENSE COUNSEL: "May I object to your instruction, then, on the record?"

THE COURT: "You have."

DEFENSE COUNSEL: "That a person's religious belief reflects their credibility —"

THE COURT: "That is not —"

DEFENSE COUNSEL: "— I'd object to that, Your Honor."

THE COURT: "— [Counsel], let me make it clear to you, that is not what I instructed the jury."[3]

In general, "the State and Federal Constitutions remove all matters of religious doctrine from the jurisdiction of secular officials." *Adoption of Fran*, 54 Mass. App. Ct. 455, 465 n.15 (2002). Consequently, use of a witness's religious beliefs for the purpose of enhancing or discrediting his or her credibility is a "long and consistently disfavored" practice. See *Commonwealth*

---

[3]The following day, the judge offered to reinstruct the jury that "[t]here are no issues of religion [in this case] except in a limited way on credibility and state of mind." Defense counsel declined the offer, saying, "I don't think you can use religion on an issue of credibility." To that the judge responded, "You can in the context of this case when there were statements of animosity, alleged animosity, made, allegedly made by the defendant toward . . . Vajda." The matter ended there and the judge gave no additional instruction.

v. *Dahl*, 430 Mass. 813, 822 (2000); *Commonwealth* v. *Murphy*, 48 Mass. App. Ct. 143, 145 (1999); Proposed Mass.R.Evid. 610.

The mere fact that evidence somehow touches on religion, however, does not bar its introduction. See *Commonwealth* v. *Rodriguez*, 57 Mass. App. Ct. 368, 373-376 (2003), and cases cited. In that case, we found no error in the prosecutor's references to the victim's display of bibies in her home when the references were designed to "show how simpleminded [she] appeared to be." *Id.* at 375. Similarly, in *Commonwealth* v. *Boyd*, 367 Mass. 169, 184-185 (1975), the Supreme Judicial Court held that the trial judge committed no error when, after a defense psychiatrist offered religious reasons as a basis for the defendant's actions, he allowed the prosecutor to cross-examine the psychiatrist on certain aspects of religious doctrine in an effort to show that the defendant's actions were in fact secularly motivated.

As noted, the prosecutor here offered the evidence of the defendant's religious beliefs in an effort to show that his references to Vajda as "Super Jew" flowed from jealousy, not distaste for Vajda's cavalier approach to religious doctrine. Viewed in hindsight, it appears that the evidentiary yield was greatly outweighed by the time and energy required to extract it. Moreover, the way the issue played out at trial shows how difficult it is to keep a secular focus on exploration of religious doctrine, belief or affiliation and why, as a result, inquiry into those areas ought to be undertaken only with the greatest of care. See generally *Commonwealth* v. *Mahdi*, 388 Mass. 679, 691-693 (1983).

That said, the judge did not abuse his discretion in allowing the Commonwealth's questions or in the limiting instruction he gave. The Commonwealth's purpose in asking the questions was both secular and relevant. The questions themselves were reasonably designed to achieve the secular goal. To be sure, the judge's instruction was ambiguous because, when he said, "this area is before you," the antecedent for "this" was unclear. Undoubtedly, a reformulated statement of the entire objection-provoking instruction would have produced clearer boundaries for the jurors' use of evidence regarding the defendant's temple attendance. Nevertheless, in his ensuing colloquy with counsel,

the judge told counsel and jury alike that, whatever else he was instructing the jury, he was not instructing them that "a person's religious belief reflects their credibility." That statement met the defendant's objection, head on, and rendered harmless whatever residual fuzziness the limiting instruction may have contained.

*Judgment affirmed.*