Commonwealth *v.* Delong.

COMMONWEALTH *vs.* JOSEPH DELONG.

No. 00-P-1485.

Suffolk. October 1, 2003. - February 26, 2004.

Present: MASON, BROWN, & BERRY, JJ.

*Robbery. Evidence,* Prior misconduct. *Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel.

At the trial of an indictment charging armed robbery, the judge did not err in admitting evidence pertaining to two prior robberies as tending to identify the defendant as the person who committed the robbery at issue, where the numerous similarities in the three robberies were sufficient to show a distinctive pattern or scheme; moreover, the probative value of such evidence outweighed its potential for prejudice to the defendant. [533-536] BERRY, J., dissenting.

A criminal defendant's counsel was not ineffective in failing to move to suppress evidence seized from the defendant's vehicle on the ground that the vehicle had been improperly impounded and subjected to an inventory search following his arrest, where the record demonstrated that the police properly impounded the vehicle, and therefore, a motion to suppress the fruits of the inventory search would not have been successful; likewise, counsel was not ineffective in failing to secure the presence at trial of two witnesses who could have corroborated the defendant's wife's alibi testimony, where the two witnesses' testimony did not pertain to the robbery at issue in the case, and in any case was merely cumulative of the wife's testimony. [536-538]

INDICTMENT found and returned in the Superior Court Department on March 31, 1998.

The case was tried before *Elizabeth B. Donovan,* J., and a motion for a new trial, filed on December 18, 2000, was heard by her.

*Thomas C. Foley* for the defendant.

*Seema Malik Brodie,* Assistant District Attorney, for the Commonwealth.

MASON, J. Following a jury trial in Superior Court, the defendant was found guilty of armed robbery of a supermarket

in the Brighton section of Boston. On appeal from his conviction and also from the denial of his subsequent new trial motion, the defendant claims that the judge erred in admitting evidence of two prior robberies by him, which was offered to identify him as the person who had committed the robbery at issue in Brighton. He also claims that he was denied the effective assistance of counsel. We affirm the conviction.

*Background.* The Commonwealth's evidence was as follows. On the morning of January 17, 1998, Kevin Beaton was working as an assistant service manager at the Star Market on Western Avenue in Brighton. At about 10:00 A.M., Beaton responded to a page from Richard LaMonica, a part-time service associate who was working in the small "money room" located behind the courtesy booth at the front of the store. The page asked for someone to pick up the cash that had been deposited from cash registers into a drop safe located at the front of the store, and to bring such cash to the money room for processing.

Beaton went to the safe with Aleika Lewis, a service clerk whom Beaton had asked to serve as his witness for the pickup of the cash. After Beaton had counted the money in the safe, both Beaton and Lewis proceeded to the courtesy booth. As they were doing so, a man whom Lewis had previously seen observing them approached Lewis and said, "excuse me." Lewis responded, "Just a minute please. I'll be right with you," and the man backed off.

A few minutes later, however, the man again approached Lewis and asked to speak to a manager. Lewis attempted to page the store manager, but when he did not respond, she asked Beaton to talk to the man.

Beaton asked the man if he could help him with anything. At that point, the man approached Beaton and said in a soft voice, "I have a .45 and this is a robbery. I want you to take me into the money room." The man had his hands in his pockets and did not display a gun.

Beaton took the man into the courtesy booth and asked another service associate who was working there, Angela Wilson, to give him the money that was in a drawer in the booth. The man said that he wanted the money in a bag, and so Beaton grabbed a Ziploc bag and put the money in it.

The man then said to Beaton, "I want to go into the money room. I want to get the pickups that you just brought in." In response to this statement, Beaton took the man into the money room and told LaMonica that a robbery was occurring and he should do what he was told. The man grabbed approximately $3,000 from the safe and put it into a different bag. He also asked about the pickups, but Beaton told him that the pickups had been put into the time lock portion of the safe and, hence, could not be retrieved for another ten minutes. The man then directed Beaton to take him to the front door of the store, and after Beaton had done so, the man left.

Beaton, Lewis, and LaMonica all subsequently described the individual who had robbed them to Boston police Detective Paul Mahoney. Each of them said that the man was a white male, approximately five feet ten inches in height, and approximately 190 to 200 pounds in weight. They also said that the man was wearing a dark stocking cap, sunglasses, a green pullover sweatshirt with a zipper and hood, and dark sweatpants. Beaton and Lewis further stated that the robber had yellowish or "messed up" teeth with gaps in them. A videotape of the incident taken from a security camera in the store also showed that the man had gaps in his teeth.

Two days later, on January 19, 1998, Newton police Officer Pedro Lopez, dressed in plain clothes, was assigned to conduct a security detail inside the Star Market located over the Massachusetts Turnpike in the Newtonville section of Newton. Sometime after 1:00 P.M., Officer Lopez's attention was directed to a man, later identified as the defendant, standing in line at the customer service desk looking nervously around in different directions while pulling his shirt over his neck. The defendant was dressed in dark clothing, was wearing a knit hat and dark sunglasses, and appeared to match the description of the person who had robbed the Star Market in Brighton just two days earlier.

Officer Lopez moved to the side of the desk in order to get a closer look at the defendant. At that point, the defendant took off his sunglasses and asked a customer service representative for a job application. After receiving the job application, the defendant turned and walked down the stairs leading to the

ground floor of the store, and then exited the store. Officer Lopez followed the defendant out of the store, along a street outside, and then around a corner onto another street.

Shortly after the defendant had walked around the corner, he turned around and walked back to Officer Lopez. At that point, Officer Lopez identified himself as a police officer, told the defendant that he matched the description of someone with whom the police wanted to talk, and asked the defendant to walk back to the store with him. As they were doing so, they met up with Detective Nils Anderson of the Newton police department, who had been conducting a surveillance of the store, and also several other officers who had arrived at the scene.

The defendant gave his name to the officers but stated that his identification was located in his car, which was parked behind a laundromat a short distance away. After obtaining the defendant's keys, Officer Lopez proceeded to the car and retrieved the defendant's identification.

In the meantime, after observing that the defendant had gaps in his lower teeth and running a warrant check on the defendant's name, Detective Anderson arrested the defendant and transported him to the police station. He also caused the defendant's car to be impounded and towed to the Newton police garage. During a subsequent inventory search of the car, the police found tags for several of the items of clothing the defendant was wearing that day, including his sweatshirt and sunglasses, and also a receipt from an Ames department store indicating that the items had been purchased at 1:14 P.M., just forty minutes prior to the stop of the defendant, and had been charged to a credit card bearing the defendant's last name.

Shortly thereafter, a photographic array was assembled and shown to each of the witnesses to the Brighton robbery, including Beaton, Lewis, LaMonica, and Wilson. Each of them independently identified the defendant as the person who had robbed the Brighton store.

At trial, Beaton, Lewis, and LaMonica, Detectives Mahoney and Anderson, and Officer Lopez all testified to the foregoing events. The Commonwealth also called as witnesses Barbara Sarnie, a service representative employed at the Star Market in

the Chestnut Hill section of Newton, and Philip Ferrante, the manager of the Star Market in the Auburndale section of Newton. Sarnie testified that, at about 10:00 A.M. on the morning of January 14, 1998, a man wearing a black hooded-type hat with some sort of attached scarf wrapped around his mouth, dark sunglasses, a sweatshirt, and dark pants, had approached her at the courtesy booth of the Chestnut Hill store and stated, "This is a robbery and I have a gun. And I want all the money in your drawer." Sarnie further testified that, in response to the man's demands, she had taken money out of a drawer in the booth and placed it in a bag the man had given her, and the robber had then turned around and walked out of the store. Sarnie also testified that she subsequently was shown the same photographic array that had been shown to the witnesses to the Brighton robbery, and had identified the defendant as the person who had robbed her.

Ferrante testified that, at about 8:50 P.M. on the evening of January 14, 1998, he had gone to the courtesy booth at the front of the Auburndale store in response to a page by a clerk indicating that someone wanted to see him. Ferrante further testified that, as he approached the booth, he noticed a man standing there who was wearing dark sunglasses, a dark sweatshirt, and dark sweatpants. Ferrante asked the man if he could help him and the man had responded by asking him if he was the manager. When Ferrante responded that he was, the man had stated to him that he had a ".45" in his sweatshirt and ordered Ferrante "to take [him] to the safe." In response to this demand, Ferrante had taken the man to the money room behind the courtesy desk and, together with a clerk who was there, had put money into a bag. The man had then took the bag and left the store with Ferrante following him out.

Unlike Sarnie, Ferrante did not testify that he had been shown a photographic array. Nevertheless, he identified the defendant at trial as the person who had robbed him and also testified that he had previously made such an identification at a prior hearing.

The Commonwealth also called as a witness Nicholas Geannaris, a loss prevention specialist employed by Star Market. Geannaris identified a series of photographs taken from a videotape made by a security camera of the Brighton robbery

which were introduced in evidence, and also videotapes of the Chestnut Hill and Auburndale robberies, as well as the incident occurring at the Newtonville Star Market on January 19, 1998, which were also introduced in evidence. Geannaris also identified two photographs taken from a videotape made by a security camera at the Brighton store at about 8:15 P.M. on the evening of January 14, 1998, which were introduced in evidence. Although the photographs were "fuzzy in appearance," Geannaris testified that they showed an individual in the produce area of the Brighton store who appeared to be dressed in dark clothing, a hood, and sunglasses, and who also appeared to have the same physique as the individual shown in the videotape that was made of the robbery of the Auburndale store occurring at 8:50 P.M. on the evening of January 14, 1998.

Finally, the Commonwealth presented evidence that the Brighton Star Market was located only one and six-tenths miles from the defendant's home on Quimby Street in Brighton, and that the Chestnut Hill and Auburndale stores were located only a few miles from the Brighton store.

The defendant's defense was misidentification, and in addition to bringing out inconsistencies in the testimony of the Commonwealth's witnesses, he called several alibi witnesses. Specifically, he called his mother, Nancy Blickenstall, his grandmother, Jeanette DeStasio, and his grandmother's longtime friend, Charles Russo, all of whom testified that the defendant had been at his mother's house in Brighton at or about 10:00 A.M. on January 17, 1998, when the robbery of the Brighton store had occurred. He also called his wife, Ellen Delong, who testified that she and the defendant had had dinner at a Ground Round restaurant in Waltham on the evening of January 14, 1998, when the robbery of the Auburndale store had occurred, and had remained there until some time after 8:00 P.M. Finally, the defendant called Steven Molineaux and John Ryan, both of whom testified that the defendant had been at work at a construction site in Boston on the morning of January 14, 1998, when the robbery of the Chestnut Hill store had occurred, and had remained there until approximately 10:00 A.M.

1. *Admission of prior bad acts evidence.* The defendant claims that the judge erred in admitting evidence pertaining to the prior

robberies at the Chestnut Hill and Auburndale stores because the Commonwealth failed to demonstrate that those prior robberies and the crime charged had "such similarities as to be meaningfully distinctive." *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 505 (1990). The defendant further claims that, even if the evidence were relevant to prove identity, the judge abused her discretion in failing to exclude the evidence on the ground that its probative value was outweighed by its potential for unfair prejudice. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 366 (2001).

A trial judge may not admit evidence of acts committed prior to a charged offense to prove the bad character or criminal propensity of the accused, but may admit such evidence if it is relevant to establish a common scheme, pattern of operation, absence of mistake, identity, intent, or motive. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). To be sufficiently probative, however, the evidence of the prior acts "must be connected with the facts of the case [and] not be too remote in time." *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 434 (2001), quoting from *Commonwealth* v. *Barrett*, 418 Mass. 788, 794 (1994).

Before evidence of prior bad acts may be admitted to show identity, the Commonwealth must show that "the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive. . . . There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged." *Commonwealth* v. *Kater*, 432 Mass. 404, 414 (2000), quoting from *Commonwealth* v. *Jackson*, 417 Mass. 830, 836 (1994).

Each of these preliminary determinations is committed to the sound discretion of the trial judge, who must also consider whether the probative value of the evidence is outweighed by its prejudicial effect. *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999). The judge's decision "will be upheld on appeal absent palpable error." *Id.*, quoting from *Commonwealth* v. *Marrero*, 427 Mass. 65, 68 (1998).

Here, the Commonwealth showed that all three robberies involved Star Markets that were located within a few miles of each other and of the defendant's home. They also occurred within three days of each other. In each instance the robber was dressed in sweat clothes and a hood or soft hat, and also wore dark sunglasses. In each instance, the robber accosted a victim near the courtesy booth of the store and said that he had a ".45," or a gun, but failed to display any such weapon. He also demanded that the money he was taking be put in a bag, and he remained calm through all three incidents. These numerous similarities were sufficient to show a distinctive pattern or scheme and, hence, warrant admission of the evidence of the prior robberies as tending to identify the defendant as the person who committed the robbery at issue. See *Commonwealth* v. *Marrero*, 427 Mass. at 71 (evidence of prior assaultive behavior by defendant occurring in same general locale as assault at issue and under similar circumstances properly admitted); *Commonwealth* v. *Leonard*, 428 Mass. at 787 (evidence of prior arson committed in same general area as arson at issue and in location near defendant's home properly admitted). Cf. *Commonwealth* v. *Sullivan*, 436 Mass. 799, 804-805 (2002) (indictments arising out of three episodes occurring in course of one month, each of which involved robbery or attempted robbery of jewelry store located in same geographic region, properly joined for trial). Contrast *Commonwealth* v. *Brusgulis*, 406 Mass. at 506-507 (evidence of prior assaults committed far apart in both time and location improperly admitted). We therefore reject the defendant's claim that the evidence of the prior robberies constituted inadmissible prior bad act evidence.

We also reject the defendant's claim that, even if the evidence pertaining to the prior robberies was otherwise admissible, the judge still should have excluded the evidence on the ground that its probative value was outweighed by its potential for prejudice. While the evidence of the prior robberies was certainly prejudicial to the defendant's case, it was not unfairly so. Moreover, the judge specifically instructed the jury that the evidence of the Chestnut Hill and Auburndale robberies was not "substantive proof that [the defendant] committed those other robberies," or evidence "that the defendant has a criminal

personality or bad character," but was admissible "solely on the limited issue of identification," and then only if the crimes were "not too remote in time." These instructions were adequate to limit any unfair prejudice to the defendant arising from admission of the evidence pertaining to the prior robberies. We therefore see no abuse of discretion in the trial judge's conclusion that the evidence was not unduly prejudicial. See *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. 810, 820-821 (1998); *Commonwealth* v. *Whiting*, 59 Mass. App. Ct. 104, 109 (2003).

2. *Ineffective assistance of counsel.* The defendant claims that his counsel was ineffective in (1) failing to move to suppress the evidence seized from his car on the ground that the car had been improperly impounded and subjected to an inventory search following his arrest; and (2) failing to secure the presence at trial of two additional alibi witnesses who could have corroborated his wife's testimony that he had had dinner at the Ground Round restaurant in Waltham on the evening of January 19, 1998, and had remained there until after 8:00 P.M.

To obtain a new trial on the ground of ineffective assistance of counsel, a defendant must show "serious incompetency, inefficiency, or inattention" on the part of his trial counsel that "likely deprived the defendant of an otherwise available, substantial ground of defen[s]e." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Here, it does not appear from the materials the defendant submitted in support of his new trial motion that defense counsel likely deprived the defendant of an otherwise available substantial ground of defense by failing to move to suppress the evidence seized from his car on the ground that the car had been unlawfully impounded. Rather, it appears from those materials (which include the transcript of a hearing a judge had held on a motion to suppress that the defendant had filed in the separate proceeding brought against him in Middlesex County as a result of the Chestnut Hill and Auburndale robberies [Middlesex County trial])[1] that, at the time the defendant was arrested outside the Newtonville Star Market on the

---

[1]The defendant claimed in this motion that the evidence seized from his car should be suppressed because, when Officer Lopez went to his car to obtain the defendant's identification, he improperly opened a plastic bag and discovered a receipt showing that the defendant had just recently purchased

afternoon of January 19, 1998, he was not accompanied by his wife or any other person who might have taken custody of his car. It also appears from the materials that the defendant's car was parked in a private parking lot that was posted with signs limiting parking to customers of the laundromat and other nearby businesses. In these circumstances, where the defendant himself suggested no alternative, and private towing was a real possibility if the police did not impound the car, the police could lawfully impound the car. See *Commonwealth* v. *Delong*, ante 122, 128 (2003). See also *Commonwealth* v. *Ellerbe*, 430 Mass. 769, 775-776 (2000); *Commonwealth* v. *Dunn*, 34 Mass. App. Ct. 702, 703-704 (1993), and cases cited. Contrast *Commonwealth* v. *Brinson*, 440 Mass. 609, 614-615 (2003) (impoundment of vehicle improper where vehicle was parked legally in commercial parking lot located considerable distance away from place of defendant's arrest).[2] Having done so, they could conduct a routine administrative inventory search of the car in the police garage pursuant to previously promulgated inventory procedures. See *Commonwealth* v. *Garcia*, 409 Mass. 675, 680-685 (1991). Hence, a motion to suppress the fruits of the inventory search conducted in this case would not have been successful.

We likewise conclude that the defendant's trial counsel did not deprive the defendant of an "otherwise available, substantial ground of defen[s]e" by failing to obtain the presence of the two additional alibi witnesses referred to by the defendant. While both of these witnesses testified at the Middlesex County trial that they had been employed at the Ground Round

the clothes he was wearing, and that the subsequent seizure was the "fruit" of this unlawful search. The motion judge agreed that Officer Lopez's actions were unlawful, but found that the seizure was the fruit of the subsequent, lawful inventory search, rather than of this initial unlawful activity.

[2] We recognize that in *Commonwealth* v. *Brinson*, 440 Mass. at 615 n.6, the Supreme Judicial Court left open the question whether an impoundment might be improper merely because there was a considerable distance between the place of the defendant's arrest and the location of his parked car, regardless of the existence of one or more attendant circumstances, such as that the car was parked in a restricted area, that might otherwise justify the impoundment. Here, however, it appears from the record that the laundromat parking lot, although not contiguous to the Star Market where the defendant was arrested, was located only a short distance away, specifically just beyond a municipal parking lot which was located across the street from the market.

restaurant in Waltham on the evening of January 14, 1998, and had seen the defendant and his wife enter the restaurant at or about 7:00 P.M. on that evening, neither of them could say definitely when the defendant and his wife had left the restaurant.[3] Moreover, their testimony pertained to the Auburndale robbery only, rather than to the Brighton robbery that was at issue in the case. The testimony was also merely cumulative of the testimony of the defendant's wife, who stated not only that she and her husband had been present at the Ground Round in Waltham on the evening of January 14, 1998, but also that she had retained and brought with her to the Middlesex County trial a receipt showing that they had not paid their bill at the Ground Round until 7:57 P.M. on that evening. In view of these circumstances, we conclude that the defendant's trial counsel was not ineffective in failing to obtain the presence of these two additional alibi witnesses. See *Commonwealth* v. *Sarmanian,* 426 Mass. 405, 407-408 (1998) (no error where counsel did not call additional witnesses but evidence from them would have been cumulative, not dispositive); *Commonwealth* v. *Rodriguez,* 57 Mass. App. Ct. 368, 372-373 (2003) (same).

*Judgment affirmed.*

*Denial of motion for new trial affirmed.*

BERRY, J. (dissenting). The indictment being tried to the jury in this case was returned in connection with a single robbery of the Brighton Star Market. However, the transcript of the trial evidence reads as if not one, but four, robbery offenses were on

---

[3]We recognize that one of the witnesses "estimated" that the defendant and his wife did not leave the restaurant until 8:45 or 9:00 P.M., and that this testimony might have tended to show, at the least, that the defendant could not have been the individual shown on the videotape taken at the Brighton store at 8:15 P.M. on the evening of January 14, 1998, whom Geannaris testified appeared to be wearing the same clothing and have the same physique as the individual shown on the videotape that was made of the robbery of the Auburndale store occurring later that evening. This was not a central issue in the case, however. Indeed, the prosecutor did not refer to the January 14 videotape taken at the Brighton store during her closing argument or assert that the defendant was the individual shown on that videotape.

trial. The other three robbery offenses were the subject of separate indictments. See *Commonwealth* v. *Delong, ante* 122, 123 & n.1 (2003) (*Delong I*).[1] Notwithstanding that, the evidence concerning the other three robbery offenses held center stage for 244 of the 443 pages of the transcript for the Commonwealth's case-in-chief, consumed fifty percent of the time for introduction of the prosecution's direct case, and predominated in the exhibits admitted — of the forty-five exhibits admitted, thirty-one were from the other robbery offenses.

As the majority opinion states, "[t]he defendant's defense was misidentification." *Ante* at 533. However, if the prospect of a misidentification defense as to the Brighton robbery had any chance of creating a reasonable doubt, that chance was snuffed in an unfair manner by the overwhelmingly and disproportionately prejudicial way in which the other bad act evidence was introduced from the trilogy of separately charged robbery offenses at stores in the Auburndale, Chestnut Hill, and Newtonville sections of Newton. "[T]he defendant's chances of obtaining a favorable jury verdict were not glowing but neither were they hopeless." *Commonwealth* v. *Adams*, 374 Mass. 722, 729 (1978). Accordingly, I dissent.

The disproportionate manner in which this other robbery evidence would be introduced was heralded in a prosecutorial prediction, just before trial began, that the evidence concerning the to-be-tried Brighton robbery would be the lesser part of the Commonwealth's case. The prosecutor stated:

> "I would think four days [for trial]. Some of that is, obviously, depending on the Court's ruling on the prior bad acts motion, because there were a series of three other robberies which the defendant committed. *Essentially, it would be a mini trial on those three. My case [the Brighton robbery] would be the smallest part of the case, and*

---

[1]The separate indictments were returned in Middlesex County for the Newton-based robbery offenses, i.e., the Auburndale and Chestnut Hill Star Market robberies and the Newtonville Star Market attempted robbery. The Newtonville case was severed. The other two robberies were tried before this Brighton case was tried. Convictions for unarmed robbery in the Auburndale and Chestnut Hill cases were affirmed by this court. See *Commonwealth* v. *Delong, ante* 122, 137 (2003) (*Delong I*). See further discussion, *infra*.

*then there would be those other witnesses on the prior bad acts.*" (Emphasis added.)

Notwithstanding this proffered prospect of mini-trials on the separately charged offenses, the judge ruled that the evidence of the three other robbery offenses would be admitted "on the issue of identification." But so much evidence from the other robberies was introduced in the Brighton case — too much evidence I would say — that, from all that appears in the record, it was as if the identification of the defendant in the Auburndale, Chestnut Hill, and Newtonville Star Market robbery offenses were also issues to be determined by the jury in deciding whether the defendant committed the Brighton robbery. That the other bad act evidence was introduced in such a manner that the Brighton jury was, in effect, called upon to assess the identification of the defendant as the actor in the other robbery offenses is a strange evidentiary construct, given that this other robbery evidence was admitted in the first place for the limited purpose of aiding the jury's determination whether the defendant was the perpetrator of the Brighton robbery.

Even accepting, as I do, that identification is a valid predicate for the probative element of the admission of other bad acts,[2] in this case, fundamental unfairness resulted because the ruling on admissibility omitted the required second stage of judicial analysis that should precede the admission of this kind of evidence — that is, judicial weighing of whether the danger of unfair prejudice substantially outweighs probative value.[3] Thus,

---

[2]The formulation of this evidentiary doctrine is that other prior and subsequent bad acts of a defendant may be introduced "to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). See *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 434 (2001).

[3]There are "two stages of evidentiary analysis to be constructed and considered prior to the admission of prior bad act evidence." *Commonwealth* v. *White*, *ante* 193, 197-198 (2003). The judge must initially determine "as a preliminary matter, that the prior bad act evidence pertains to the defendant's knowledge, intent, motive, method, identity, or some other relevant issue at the trial . . . . *[Second, and in addition,] the judge . . . also must consider whether the probative value of the evidence is outweighed by its prejudicial effect.* (Citations omitted.)" (Emphasis added.) *Id.* at 198, quoting from *Commonwealth* v. *Leonard*, 428 Mass. 782, 786 (1999). Accord *United States* v. *Sebaggala*, 256 F.3d 59, 67 (1st Cir. 2001) ("A two-pronged framework . . . governs the admissibility of 'bad act' evidence").

notwithstanding that the Commonwealth's proffer was like a red flag, signaling that if the other bad act evidence were to be admitted in the fashion the Commonwealth predicted, a high risk of unfair prejudice would be posed, the trial court did not conduct a second stage balancing analysis of probativeness versus prejudice. Such balancing, if undertaken, should have led to the crafting of limitations on the proposed evidence. Free of any such limitations, the Commonwealth had an open field upon which it introduced an ultimately distorted prosecutorial case tilted to the other three separately charged robbery events. The "exceptions [for the admission of other bad act evidence] are not without limitation. The inherent danger in improperly admitting evidence of a defendant's prior bad acts is that it diverts the attention of the jury from the [crime] immediately before it; and, by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him." *Commonwealth* v. *Baker*, 440 Mass. 519, 530 (2003) (citations and quotations omitted).

In this vein, based on my review of the trial record, I believe that the boundaries of the other bad act doctrine as providing relevant evidence of identification were exceeded. Given the number of in-court identifications of the defendant, as well as out-of-court identifications based on photographic spreads and other identification procedures involving witnesses to the Auburndale, Chestnut Hill, and Newtonville Star Market robbery offenses, the defense in the Brighton case was confronted with extrajudicial and extra-indictment-on-trial identification procedures that were not tested, or testable, in pretrial proceedings in the Brighton case. This, in turn, led to unusual and troubling trial sequences, in which, for example, defense counsel advancing a misidentification theory of defense in the Brighton trial was called upon to challenge on cross-examination whether a witness to the Chestnut Hill robbery actually made a positive identification in an out-of-court identification procedure when viewing a photographic spread and whether, in the trial underlying *Delong I*, the same Chestnut Hill robbery witness had mistakenly identified a juror as the robber.[4]

---

[4]In the trial of the robberies at the Auburndale and Chestnut Hill Star Markets, the trial judge denied the Commonwealth's motion to admit evidence

Furthermore, the unfairly prejudicial effect was enhanced because the prosecution introduced evidence of the other robbery offenses and extrajudicial identifications in duplicate,' sometimes triplicate, effect. The saturation effect of the repetition in these "mini-trials" of the other robberies was unrelenting. The first foray came with the opening testimony of Detective Nils Anderson, who had worked on discrete parts of the three Newton-based robbery investigations and who played a main role in the arrest of the defendant following the Newtonville Star Market attempted robbery. Anderson's testimony included fulsome (second-hand) details of what had transpired inside the three Newton-based Star Markets as the respective robberies and attempted robbery unfolded. This was based on Anderson giving a scene-by-scene description of what was depicted in the exhibit videos and still pictures, which he repeatedly referred to in connection with *armed robberies* in the other three places. (This, despite the fact that the defendant had not been tried or convicted for armed robbery in the trial underlying *Delong I*, see note 1, *supra*.) To this nonfoundational evidence was added Anderson's recounting of out-of-court statements that certain Star Market employees had given to the police, as well as references to the out-of-court identification procedures conducted in the other cases. (Under what possible theory certain of the non-percipient and hearsay evidence contained in large portions of Anderson's testimony came in remains unclear. When challenged, the prosecutor at times enigmatically offered it as relevant to Anderson's state of mind.)

Following Anderson's comprehensive narrative as the first witness in the "mini-trial" order of proof, the factual background he had testified to (but not witnessed inside the Star Markets) arrived in triplicate from three witnesses who had been present inside the supermarkets. The witness from the Chestnut Hill

of the Brighton robbery. Although the attempted robbery at Newtonville (where the defendant was arrested and his car searched) had been severed from the other two indictments, the judge there admitted this evidence concerning the Newtonville event as subsequent bad act evidence. This court affirmed that determination in *Delong I, supra* at 130-131, noting that, notwithstanding the severance, the evidence was relevant. However, the admission of the Newtonville evidence in that trial, it appears, was not introduced in the manner at issue here and, of course, was limited to one other Newton-based bad act, not mini-trials on three separately charged bad acts.

Star Market, Barbara Sarnie, repeated the entire background of the robbery along the lines Anderson had already drawn. Turning to identification, Sarnie was shown the same photographic array that had been shown to a Brighton witness and previously introduced (exhibit six). Then, Sarnie's testimony concerning her out-of-court identification of a photograph in a spread (at one point, she referred to two different photographic numbers in the spread) was ultimately used to suggest that Sarnie had identified the defendant's photograph (number three) in that same array, as had certain Brighton witnesses. The way this out-of-court identification procedure in a separately charged case was referenced at trial, it seems to me, improperly suggested corroboration and validation by another witness in a different case (the Chestnut Hill robbery) for the out-of-court identification of the defendant's picture in this photographic spread by a Brighton witness.

Similarly, the identification evidence from the Auburndale robbery was admitted in an overly prejudicial manner. The witness Philip Ferrante made an in-court identification of the defendant as the perpetrator of the Auburndale robbery. In addition, Ferrante testified that he had also identified the defendant in a prior proceeding.

The identification evidence from the Newtonville attempted robbery was clearer and more direct, which made sense since, after all, the defendant had been arrested at this site. However, by this point, the damage had been done. Hence, determinations of the degree to which the Newtonville evidence added to the prejudice already steeped in the record, and whether the evidence of the Newtonville attempted robbery, the identification of the defendant upon arrest, and the attendant car search would not have crossed the undue prejudice line if presented singularly rather than as one part of a very long trilogy, are issues that need not be unraveled. I would only note that in the trial underlying *Delong I,* evidence of the Newtonville attempted robbery alone was admitted, evidence of the Brighton robbery was excluded, and the convictions were affirmed. See note 4, *supra.*

As previously noted, in all three instances, the record was further supplemented by admission as exhibits of the supermarket robbery videos, still shots, and photographic spreads from

the Auburndale, Chestnut Hill, and Newtonville robbery offenses. Using these exhibits, Anderson published to the jury what were described as his compiled "comparisons" (taken from these photographic exhibits, it appears — the record is not entirely clear) to show the jury potential similarities for them to consider in determining whether the defendant was the identified committer of the three separately charged offenses *and* the Brighton robbery.

Given the problematic way in which the other bad act identification procedures and photographic spreads were introduced in the trial record, and the disproportionality of the evidence relating to these other crimes, the judge's generic and abbreviated instruction to the jury that they were to consider the evidence of the robberies at the Chestnut Hill and Auburndale Star Markets "solely on the limited issue of identification" did not cure the prejudicial and unfair effect.[5]

---

[5]There were flaws in the instruction. First, and perhaps most importantly, the instruction did not charge that the jury could not consider the defendant's commission of the other robberies as proof that the defendant had committed the Brighton robbery. Furthermore, the instruction omitted the Newtonville evidence, referring to only the Chestnut Hill and Auburndale robberies. There was also an inconsistency in setting forth the litany of all potential purposes for the admission of other bad act evidence, given that the evidence was to be limited to identification alone. Finally, there was an internal inconsistency in the phraseology of the instruction, which states initially in the negative, and, then, in the positive, that the other bad acts were substantive evidence that the defendant had committed the other robberies.

> "You've also heard evidence of robberies of the Star Market at Chestnut Hull [*sic*] and Auburndale. Let me explain to you that the defendant is not charged with those robberies. As I said, you've heard mention of those other robberies, and you are not — you may not take that as substantive proof that the [defendant] committed those other robberies, nor may you consider it as proof that the defendant has a criminal personality or bad character, but you may consider it solely on the limited issue of identification. You may not consider this evidence for any other purpose. Specifically, you may use it to conclude that the defendant committed the other robberies. This type of evidence is not admissible to demonstrate the defendant's bad character or propensity to commit the crimes charged. But if not too remote in time, it may be admissible to show motive, opportunity, state of mind, preparation, plan or scheme, pattern of conduct, relationship between a defendant and a victim, knowledge, identification, or absence of mistake or accident."

"It is reasonable for us to be confident that in most cases limiting instructions accomplish their intended purpose. Nevertheless, in cases like the instant one, where the evidence subject to limitations has an extremely high potential for unfair prejudice, we have a duty to be skeptical as to the effectiveness of limiting instructions. They have been characterized by Judge Learned Hand as 'the recommendation to the jury of a mental gymnastic which is beyond, not only their power, but anybody's else.' *Nash* v. *United States*, 54 F.2d 1006, 1007 (2d Cir. 1932). 'The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.' *Krulewitch* v. *United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring)."

*Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681 (1974) (Hennessey, J., concurring).

When the Commonwealth rested, the mini-trials of the Newton-based robberies and attempted robbery held predominance, and as the prosecutor had predicted, the actual case on trial was "the smallest part of the case." The overshadowing of the other bad act evidence, which was taken to the extreme, leaves me unable to say that the mass of evidence adduced concerning the other robberies and the in-court and out-of-court identifications by witnesses to these other robberies did not give rise to prejudicial error, and "did not influence the jury, or had but very slight effect . . . [and] that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). Rather, from my review of the trial record, I believe "it is impossible to conclude that substantial rights were not affected." *Ibid.*[6] Therefore, I dissent.

---

[6]Defense counsel had opposed the introduction of the other robbery evidence in the hearing on the Commonwealth's motion in limine and preserved objection to its admission. Hence, the prejudicial error standard applies.